IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LORES NGUYEN SCHWIND, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | |
| | ) | |
| SPECIALIZED LOAN SERVICING, LLC, | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff LORES NGUYEN SCHWIND, through undersigned counsel, brings this complaint against Defendant SPECIALIZED LOAN SERVICING, LLC, and alleges as follows:

### NATURE OF THE ACTION

1. Plaintiff brings this action for damages for violations of the Real Estate Settlement Procedures Act ("RESPA") and the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA").

2. All of the claims stated herein stem from Defendant's wrongful servicing and debt collection activities related to a mortgage loan secured by a second lien on Plaintiff's home.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 as Plaintiffs' claims arise, in part, under RESPA, 12 U.S.C. § 2614. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

4. Venue is proper in this District under 28 U.S.C. § 1391, as the subject property is located here and the events complained of occurred in this District.

### PARTIES

1

5. Plaintiff Lores Nguyen Schwind is a natural person who resides at 3907 North Damen Avenue, Unit 3, Chicago, Illinois 60618.

6. Plaintiff Lores Nguyen Schwind purchased the property located at 2104 West Montrose Avenue, Unit 3, Chicago, Illinois 60618 (the "subject property") on or about August 11, 2006 as her primary family residence.

7. Plaintiff is a "consumer" as defined by Section 1(e) of ICFA.

8. Defendant Specialized Loan Servicing, LLC ("SLS") is a Delaware limited liability company with its principal place of business at 8742 Lucent Boulevard, Suite 300, Highlands Ranch, Colorado 80129.

9. SLS does business in Illinois, including in this District, and has a registered agent in Illinois.

10. SLS acts as a mortgage lender and servicer of mortgage loans, including in the State of Illinois, and previously serviced the subject loan.

**FACTS SUPPORTING CAUSES OF ACTION**

11. On August 11, 2006, an Plaintiff's authorized agent executed a promissory note and security agreement with National City Mortgage in the amount of $60,000.00 on behalf of Plaintiff (the "subject loan").

12. The subject loan was secured by a second priority lien on the subject property, which is designed principally for the occupancy of one family.

13. Plaintiff used the proceeds of the subject loan for the purchase of the subject property as her primary family residence.

14. The subject loan is a federally related mortgage loan as defined in Section 2602(1) of RESPA.

15. On August 24, 2006, National City Mortgage transferred its interest in the subject loan to E*Trade Bank, now known as PNC Financial Services Group, Inc. ("PNC").

**A.  Plaintiff makes over $7,000 in prepayments on the subject loan to PNC that PNC applies toward future monthly payments, which pushes back the due date for the next payment owed on the subject loan**

16. While PNC owned the subject loan, Plaintiff made several prepayments on the subject loan.

17. PNC applied nearly all of these prepayments towards future monthly payments, not to the principal balance of the subject loan.

18. As a result, when Plaintiff made a prepayment or series of prepayments that exceeded the regular $543.25 monthly payment, the "paid through date" on the subject loan would be extended by one month.

19. For example, in April 2011, Plaintiff made three payments of $543.25 to PNC, which PNC applied to future payments.

20. In this example, when Plaintiff made three payments of $543.25 in April 2011, PNC applied one payment to the amount due in April 2011, the second payment to the amount that would come due in May 2011, and the third payment to the amount that would come due in June 2011.

21. As a result, Plaintiff was not obligated to PNC to make another payment on the subject loan until July 2011—in other words, the "paid through date" was July 2011.

22. By February 2015, Plaintiff had made payments that resulted in a "paid through date" of April 1, 2016.

23. The "paid through date" of April 1, 2016 meant that Plaintiff had made prepayments in an amount equal to at least thirteen payments of $543.25, or $7,062.25.

3

24. Although PNC applied Plaintiff's prepayments to push back the "paid through date", Plaintiff believed that PNC applied her prepayments to reduce the principal balance of the subject loan.

25. Plaintiff held this believe because she made payments using PNC's online payment system, which included a blank form for "comments", and Plaintiff included in the "comments" form written instructions that her prepayments be applied to reduce the principal balance of the subject loan.

26. Plaintiff did not know that PNC had not applied her prepayments to the principal balance because PNC did not send Plaintiff monthly mortgage statements on the subject loan.

**B.   SLS acquires the subject loan from PNC and erroneously moves up the "paid through date" without providing a credit to Plaintiff for the related prepayments**

27. SLS acquired the subject loan and servicing rights thereon from PNC in February 2016.

28. In March and April 2015, Plaintiff continued to make additional prepayments on the subject loan, which further pushed back the "paid through date" from April 1, 2016, to September 1, 2016,

29. In April 2015, Plaintiff reviewed the monthly mortgage statements on the subject loan that she had received from SLS, and saw that none of the prepayments she had made to PNC or to SLS had been applied to reduce the principal balance of the subject loan.

30. Plaintiff contacted SLS after she noticed this issue, and told SLS to reverse the application of her prepayments towards the "paid through date", and instead to apply all such prepayments to reduce the principal balance of the subject loan.

4

31. In May 2015 SLS reversed the application of all prepayments that Plaintiff made to SLS since the transfer from PNC in February 2016, totaling at least $2,716.25, which SLS had initially applied to push back the "paid through date" from April 1, 2016, to September 1, 2016.

32. While making these adjustments, however, SLS erroneously moved up the "paid through date" from April 1, 2016, to March 1, 2015, without providing any related credit to Plaintiff's account.

33. For example, when SLS adjusted the "paid through date" from September 1, 2016, to April 1, 2016, it resulted in a credit of $2,716.25—an amount equal to five payments of $543.24 that had been applied to the payments that would have come due in April, May, June, July, and August 2016—and SLS applied the credited amount to the principal balance of the subject loan.

34. Thus, when SLS adjusted the "paid through date" from April 1, 2016 to March 1, 2015, it should have resulted in a credit of $7,062.25—an amount equal to thirteen payments of $543.25 that had been applied to the payments that would have come due in March, April, May, June, July, August, September, October, November, and December 2015, and January, February, and March 2016.

35. SLS failed to provide any such credit to Plaintiff's account, or to make the appropriate reduction to the principal balance of the subject loan.

C. **Plaintiff alerts SLS to the servicing error, but SLS falsely claims that no error of any kind had been made on Plaintiff's account**

36. When Plaintiff reviewed her May 2015 mortgage statement from SLS, she noticed that the information regarding the principal balance on the subject loan had changed, and she did not agree with the changes.

5

37.     On May 11, 2015, Plaintiff requested a payment history on the subject loan from SLS.

38.     SLS provided Plaintiff the payment history to Plaintiff on May 13, 2015.

39.     After reviewing the payment history, Plaintiff determined that SLS had made an error on her account.

40.     On May 13, 2015, Plaintiff sent SLS a letter identifying herself and the account information for the subject loan, and stating the reasons Plaintiff believed that SLS had made an error on her account.

41.     On June 10, 2015, SLS sent Plaintiff a letter that stated, in part, as follows:

[W]e have determined that on May 1 and May 15, 2015, we made the necessary adjustment and reapplied funds received by SLS since the service transfer. We are unable to change the application of payments done by prior servicers. The account is currently due for the June 1, 2015 contractual payment in the amount of $543.25. Payments are due on the first (1st) of each month with a fifteen (15) day grace period before fees are assessed. We apologize for any inconvenience this has caused you.

42.     These statements were false and misleading, because SLS had failed to credit Plaintiff the $7,062.25 related to changing the "paid through date" from April 1, 2016 to March 1, 2015.

43.     On July 10, 2015, Plaintiff sent SLS another letter identifying herself and the account information for the subject loan, responding to claims made by SLS in its June 10, 2015 letter, and stating the reasons Plaintiff believed that SLS had made an error on her account.

44.     On August 3, 2015, SLS sent Plaintiff a letter that stated, in part, as follows:

Our records indicate that we have previously responded to a similar request with our letter dated July 10, 2015. A copy of our original correspondence is enclosed for reference. Please note that SLS has complied with your requests for information in accordance with both state and federal law. As such, we consider this matter resolved . . . . We have reversed payments as far back to the transfer of servicing and applied all the additional payments paid to the Principal balance. The correction was made May 1 and May 15, 2015 and the correct placed the account currently due for the monthly payment of August 1, 2015. When the loan transferred you were due for April 1, 2016.

45. These statements were false and misleading, because SLS had failed to credit Plaintiff the $7,062.25 related to changing the "paid through date" from April 1, 2016 to March 1, 2015.

46. On August 22, 2015, Plaintiff sent SLS another letter identifying herself and the account information for the subject loan, responding to claims made by SLS in its August 3, 2015 letter, and stating the reasons Plaintiff believed that SLS had made an error on her account.

47. On September 22, 2015, SLS sent Plaintiff a letter that stated, in part, as follows:

> When your loan transferred over February 7, 2015 your account was paid up until May 1, 2016. In May 2015 your account was paid until September 1, 2016. Your payments from May 1, 2015 through September 1, 2016 were reversed. Payments were reapplied to March 1, 2015, April 1, 2015, and May 1, 2015 with the remaining going towards your principal balance. Your calculations are based on if your account was paid ahead, which it was not since it was reversed . . . . In researching your account, we have found no errors.

48. These statements were false and misleading, because SLS had failed to credit Plaintiff the $7,062.25 related to changing the "paid through date" from April 1, 2016 to March 1, 2015.

49. On October 6, 2015, Plaintiff sent SLS another letter identifying herself and the account information for the subject loan, responding to claims made by SLS in its September 22, 2015 letter, and stating the reasons Plaintiff believed that SLS had made an error on her account.

50. On November 2, 2015, Plaintiff sent SLS another letter identifying herself and the account information for the subject loan, following up on SLS's failure to respond to Plaintiff's October 6 letter, and re-stating the reasons Plaintiff believed that SLS had made an error on her account that she had provided in the October 6 letter.

51. On November 10, 2015, Plaintiff sent SLS another letter identifying herself and the account information for the subject loan, following up on the status of her prior letters

identifying SLS's servicing errors, and stating the reasons that Plaintiff believed that SLS had made an error on her account.

52. On November 30, 2015, SLS sent Plaintiff a letter that stated, in part, as follows:

Our records show we have previously responded to a similar request with our letters dated June 10, 2015 and September 22, 2015 . . . . We have not received a request for new or additional information. As such, we consider this matter resolved . . . . In researching your account, we have found no errors.

53. These statements were false and misleading, because SLS had failed to credit Plaintiff the $7,062.25 related to changing the "paid through date" from April 1, 2016 to March 1, 2015.

54. On December 10, 2015, Plaintiff sent SLS another letter identifying herself and the account information for the subject loan, responding to claims made by SLS in its November 30, 2015 letter, and stating the reasons that Plaintiff believed that SLS had made an error on her account.

55. Plaintiff did not receive a response from SLS to her December 10, 2015 letter.

**D.    Damages suffered by Plaintiff**

56. Plaintiff closed on a refinancing of the subject loan in December 2015.

57. As a direct and proximate result of SLS's misconduct, the balance of the subject loan that was refinanced was higher than it should have been by not less than $7,062.25, plus related interest, leaving Plaintiff indebted by not less than $7,062.25 more than she would have been if SLS had not violated RESPA and ICFA.

58. As a direct and proximate result of SLS's misconduct, SLS received more money to pay off the subject loan that it was entitled to receive by not less than $7,062.25, plus related interest.

59. As a direct and proximate result of SLS's misconduct, Plaintiff paid interest on the $7,062.25 that SLS failed to credit to Plaintiff's account, which SLS was not entitled to receive.

60. As a direct and proximate result of SLS's misconduct, Plaintiff has paid and continues to pay interest on the $7,062.25 that SLS should have credited to her account, because such amount was included in the principal balance of the loan that refinanced the subject loan.

61. As a direct and proximate result of SLS's misconduct, Plaintiff incurred travel expenses, court costs, and litigation expenses in connection with trying to compel SLS to recognize and correct its servicing errors on the subject loan.

62. Plaintiff has also suffered other damages due to SLS's misconduct, including but limited to aggravation, inconvenience, loss of time, and emotional including anxiety, stress, embarrassment, confusion, shock, and fear.

## COUNT I – VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

63. Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

64. The subject loan is a "federally related mortgage" under RESPA and 12 C.F.R. 1024.2.

65. SLS qualifies as a "servicer" under Section 2605(i)(2) and 12 C.F.R. 1024.2.

### A. Violations of Section 2605(e)(1) and 12 C.F.R. 1024.35(d)

66. RESPA Section 2605(e)(1) states as follows:

**(1) Notice of receipt of inquiry**

**(A) In general**

**If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public**

> **holidays, Saturdays, and Sundays) unless the action requested is taken within such period.**
>
> **(B) Qualified written request. For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—**
>
>> **(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and**
>>
>> **(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.**

67.     12 C.F.R. 1024.35(a) and (d) state, in relevant part, as follows:

**(a) Notice of error. A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred. A notice on a payment coupon or other payment form supplied by the servicer need not be treated by the servicer as a notice of error. A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request.**

**\*\*\***

**(d) Acknowledgment of receipt. Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving a notice of error from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the notice of error.**

68.     Plaintiff sent SLS a "qualified written request", that was also a "notice of error" regarding an error in servicing the subject loan, on the following dates: May 13, 2015; July 10, 2015; August 22, 2015; October 6, 2015; November 2, 2015; and December 10, 2015 (collectively, the "NOEs" or "Notices of Error").

69.     In each instance, SLS failed to provide a written response acknowledging receipt within five business days of the NOE, and failed to take the action requested within that period in violation of RESPA Section 2605(e)(1) and 12 C.F.R. 1024.35(d).

10

70. With the NOEs sent on October 6, 2015 and December 10, 2015, SLS did not acknowledge receipt or response in any fashion, in violation of RESPA Section 2505(e)(1) and 12 C.F.R. 1024.35(d).

### B. Violations of Section 2605(e)(2) and 12 C.F.R. 1024.35(e)

71. RESPA Section 2605(e)(2) states as follows:

**(2) Action with respect to inquiry. Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—**

**(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);**

**(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—**

**(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and**

**(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or**

**(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—**

**(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and**

**(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.**

72. 12 C.F.R. 1024.37(e) states, in relevant part, follows:

**(e) Response to notice of error -**

**(1) Investigation and response requirements -**

**(i) In general. Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:**

**(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or**

11

> **(B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.**

73. SLS failed to correct the errors identified by Plaintiff in the NOEs, in violation of RESPA Section 2605(e)(2) and 12 C.F.R. 1024.35(e).

74. SLS failed to conduct a reasonable investigation into the errors identified by Plaintiff in the NOEs, in violation of RESPA Section 2605(e)(2) and 12 C.F.R. 1024.35(e).

75. SLS failed to provide a statement of the reason or reasons for its determination that the errors identified by Plaintiff in the NOEs had not occurred, in violation of RESPA Section 2605(e)(2) and 12 C.F.R. 1024.35(e).

76. With respect to the NOEs sent on October 6, 2015 and December 10, 2015, SLS failed to respond in any fashion, in violation of RESPA Section 2605(e)(2) and 12 C.F.R. 1024.35(e).

    C. **Violations of Section 2605(k) and 12 C.F.R. 1024.38**

77. RESPA Section 2605(k)(1)(E) states as follows:

**(1) IN GENERAL. A servicer of a federally related mortgage shall not—**

**(E) fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter**.

78. 12 C.F.R. 1024.38(a), states, relevant part, as follows:

**(a) Reasonable policies and procedures. A servicer shall maintain policies and procedures that are reasonably designed to achieve the objectives set forth in paragraph (b) of this section.**

**(b) Objectives –**

**(1) Accessing and providing timely and accurate information. The policies and procedures required by paragraph (a) of this section shall be reasonably designed to ensure that the servicer can:**

**\*\*\***

**(ii) Investigate, respond to, and, as appropriate, make corrections in response to complaints asserted by a borrower**

**\*\*\***

79. Upon information and belief, SLS failed to maintain policies and procedures that were reasonably designed to provide timely and accurate information to Plaintiff regarding the subject loan.

80. Upon information and belief, SLS failed to maintain policies and procedures that were reasonably designed to ensure that SLS could investigate, respond to, and make corrections in response to Plaintiff's six separate NOEs.

81. SLS failed to comply with RESPA Sections 2605(e)(1), (e)(2), and (k) in connection with each of the six separate NOEs sent to SLS by Plaintiff.

82. SLS's failure to comply with RESPA is part of a pattern and practice of non-compliance with the provisions of RESPA.

83. SLS's failure to comply with RESPA was intentional and willful.

84. Plaintiff suffered damages proximately caused by SLS's misconduct, including as set forth in paragraphs 56-62 above.

WHEREFORE, Plaintiff requests that this Honorable Court:

a. grant judgment in Plaintiffs' favor against SLS;

b. award Plaintiff actual and additional damages pursuant to Section 2605(f) of RESPA;

c. award Plaintiff reasonable attorneys' fees and costs pursuant to Section 2605(f) of RESPA; and

    d.    award any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT

85.    Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

86.    Plaintiff is a "consumer" and "person" as defined under Sections 1(c) and (e) of ICFA.

87.    Section 2 of ICFA prohibits unfair or deceptive acts or practices and states, in relevant part, as follows:

**Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.**

88.    SLS violated Section 2 of ICFA by engaging in unfair acts in the course of conduct involving trade or commerce when dealing with Plaintiff.

89.    SLS made unfair misrepresentations to Plaintiff as to the servicing errors identified or referred to in the NOEs, the status of the subject loan, the amounts owed, and the application of Plaintiff's payments.

90.    SLS also engaged in an unfair conduct regarding its refusal to correct servicing errors that resulted in an improper increase in the balance of the subject loan by not less than $7,062.25, and an improper change of the "paid through date" without making the appropriate credits on the account.

91.    It was unfair for SLS to, among other things:

    i.    adjust the "paid through date" to March 2015 without providing a corresponding credit on the balance of the subject loan;

      ii.      refuse to conduct a proper investigation into this servicing error, despite six separate NOEs from Plaintiff, which requests included ample information regarding the error;

      iii.      fail to comply with RESPA's requirement of acknowledgment of receipt of the NOEs within five business days for each of the six separate NOEs;

      iv.      completely ignore two of Plaintiff's NOEs, and provide no response whatsoever thereto;

      v.      collect not less than $7,062.25 more than it was entitled to collect for payoff of the subject loan in connection with Plaintiff's refinancing of the subject loan;

      vi.      force Plaintiff to incur no less than $7,062.25 in additional indebtedness in connection with the refinancing of the subject loan; and

      vii.      collect and incur interest on at least $7,062.25 that was erroneously not credited to the subject loan.

92. It was unfair for SLS to provide Plaintiff with conflicting and false information regarding the status of the subject loan, the balance of the subject loan, and SLS's efforts to investigate and correct the error pointed out in Plaintiff's NOEs on six separate occasions.

93. It was unfair for SLS to refuse to communicate with Plaintiff clearly or respond to Plaintiff's disputes honestly or accurately.

94. SLS's communications and conduct were purposefully confusing, misleading, oppressive, and designed to maximize profits from a scheme to collect prepayments, charge fees, and willfully ignore errors in their servicing to extract additional amounts from Plaintiff and to avoid applying credits to Plaintiff's account.

95. Plaintiff did rely on SLS's actions by (a) continuing to make payments on the incorrect "paid through date" deadline stated by SLS and (b) incurring a debt that was inflated by not less than $7,062.25 in connection with refinancing the subject loan and making payments on such debt.

96. Plaintiff's inquiries and disputes regarding servicing of the subject loan were never properly investigated or accurately answered.

97. SLS's conduct was willful, malicious, unfair, arbitrary, and designed to maximize SLS's profits at the expense of Plaintiff.

98. SLS's conduct offends public policy as it demonstrates an industry-wide practice of aggressively pursuing collection of amounts not owed, charging unearned interest to a borrower to make a profit, and forcing borrowers to make payments without properly crediting the payments.

99. SLS's actions cause substantial injury to consumers generally because:

    i. consumers reasonably expect their contracts to be honored, their loans and accounts to be properly managed, and their payments to be properly applied;

    ii. consumers reasonably expect that creditors and loan servicers will communicate with them truthfully and accurately regarding their account and payments;

    iii. consumers reasonably expect that loan servicers will not make false representations or induce payments on false pretenses;

    iv. consumers reasonably expect that, if there is a dispute, the servicer will take honest efforts to resolve the dispute instead of obfuscating the facts; and

    v. consumers reasonably expect that their servicers will not profit from their loan payments beyond the allowable interest rate and payment schedule.

100. SLS's overall scheme was designed to thwart Plaintiff's attempts to enforce the proper terms of the subject loan, and to discourage Plaintiff from obtaining the credit or adjusted "paid through date" that she was entitled to.

101. Plaintiff could not avoid these immoral undertakings because SLS would not accurately communicate with her. Plaintiff wase forced into a perpetual state of confusion, depriving her of a peaceful existence.

102. SLS's conduct was unethical and unending, and Plaintiff had no actual control over, (a) correcting errors in her mortgage statements, (b) how her payments were being applied, (c) the payoff amount demanded by SLS in connection with the refinancing of the subject loan, and (d) whether SLS's representations were truthful.

103. All of SLS's conduct described herein occurred in the course of conduct involving trade or commerce.

104. SLS failed to employ appropriate mechanisms to reasonably resolve Plaintiff's servicing disputes.

105. An award of punitive damages is appropriate because SLS's conduct was outrageous, willful, wanton, and showed reckless disregard for the rights of Plaintiff during the entire course of her relationship with SLS.

106. Plaintiff suffered damages proximately caused by SLS's misconduct, including as set forth in paragraphs 56-62 above.

WHEREFORE, Plaintiff requests that this Honorable Court:

a. grant judgment in Plaintiff's favor against SLS;

b. award Plaintiff actual and punitive damages in an amount to be determined at trial for the underlying ICFA violations;

c. award Plaintiff reasonable attorneys' fees and costs pursuant to Section 10a(c) of ICFA; and

d. award any other relief this Honorable Court deems equitable and just.

**Plaintiff Demands Trial by Jury.**

                Respectfully Submitted,

                By: /s/ *Daniel Brown*
                Daniel Brown (ARDC # 6299184)
                The Law Office of Daniel Brown
                208 S. Jefferson St., Suite 204
                Chicago, IL 60661
                (773) 453-7410
                daniel@mainstreetattorney.com

                *Attorney for Plaintiff*

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that all Defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of Plaintiff's claims. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that such Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of any Defendant.

By: /s/ *Daniel Brown*
   Daniel Brown

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorneys' fees have been assigned to counsel.

By: /s/ *Daniel Brown*
   Daniel Brown